**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

INTERNATIONAL PAINTERS AND
ALLIED TRADES INDUSTRY
PENSION FUND, and Daniel R.
Williams, in his official capacity as a
trustee, *et al.,*

    *Plaintiffs,*

    v.

SHOEMAKER LLC dba/aka THE
GLASS DOCTOR aka GLASS DOCTOR
OF VIENNA

    *Defendant*.

Civil Action No. 24-cv-3575-ELH

**MEMORANDUM OPINION**

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C. §§ 1001 *et seq*. and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  Plaintiffs International Painters and Allied Trades Industry Pension Fund ("Pension Fund"); Finishing Trades Institute f/k/a International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund ("FTI"); and Daniel R. Williams, in his official capacity as a trustee of the Pension Fund (collectively, the "Fund"), have filed suit against Shoemaker LLC dba/aka the Glass Doctor aka Glass Doctor of Vienna ("Shoemaker"), seeking an audit of defendant's payroll records dating to January 1, 2019.  ECF 1 (the "Complaint").  Shoemaker is an employer within the meaning of ERISA § 3(5), 29 U.S.C. § 1002(5), and the National Labor Relations Act ("NLRA"), § 2(2), 29 U.S.C. § 152(2).  *See* ECF 1, ¶ 5.

Plaintiffs have also brought suit on behalf of the Political Action Together Fund ("PAT Fund") and the Labor Management Cooperation Initiative ("LMCI").  *Id.* ¶¶ 2, 3, 4.  However, the PAT Fund and LMCI  are not named as plaintiffs.  Plaintiffs refer to the Pension Fund and FTI

collectively as the "ERISA Plaintiffs." ECF 1, ¶ 1. Plaintiffs refer to the PAT Fund and LMCI as the "Bargained Entities." *Id.* ¶ 3.

Suit was filed on December 11, 2024. ECF 1. The Complaint asserts one claim against Shoemaker, titled: "For Audit Compliance Against Defendant". *Id.* at 6. Plaintiffs contend that defendant is in breach of its "contractual duty under the Bargaining Agreement, and Trust Agreements . . . to permit an audit of its records to determine whether it is making full and prompt payment of all sums required to be paid by it to Plaintiffs, and to pay Plaintiffs any amounts found due as a result of an audit, including audit fees." *Id.* ¶ 17. In particular, plaintiffs allege that defendant has failed to permit an audit of its payroll records for the period from January 1, 2019 through the date of inspection, in violation of Shoemaker's obligations pursuant to its collective bargaining and other labor agreements with plaintiffs and its statutory obligations under ERISA and the LMRA. ECF 1, ¶¶ 11, 14, 18; *id.* at 7.

Plaintiffs timely served Shoemaker with the suit on January 10, 2025. ECF 4. But, Shoemaker failed to respond. *See* Docket. As a result, plaintiffs moved for an order of default against Shoemaker. ECF 5. The Clerk entered a default on February 5, 2025. ECF 6.

On the same date, the Clerk sent a "Notice Of Default" to Shoemaker. ECF 7 ("Notice"). The Notice informed Shoemaker that "an order of default was entered" against it and that Shoemaker had thirty days from the date of the Notice to "file a motion to vacate the order of default." *Id.* In addition, the Notice warned Shoemaker that if it did "not take action," the Court would "act promptly on any pending motions for entry of default judgment, which may result in a monetary judgment against" Shoemaker. *Id.*

On September 4, 2025, pursuant to Fed. R. Civ. P. 55(b)(2), plaintiffs moved for entry of default judgment. ECF 8.[1]  The motion is supported by a memorandum (ECF 8-2) (collectively, the "Motion"), and several exhibits.  *See* ECF 8-3 to ECF 8-7.  In the certificates of service for the Motion and the exhibits, plaintiffs' counsel attests that plaintiffs delivered a copy of the Motion to Shoemaker by mail, sent to the same address listed on the summons (*see* ECF 3), and via email.  *See, e.g.,* ECF 8 at 5.  Shoemaker has not responded.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, as modified.

## I.    Factual Background[2]

This action arises from a collective bargaining agreement and related trust agreements subject to ERISA and the LMRA.  *See* ECF 1, ¶¶ 6, 7, 18.

As stated, according to plaintiffs, Shoemaker is an employer under ERISA § 3(5), 29 U.S.C. § 1002(5), and the NLRA § 2(2), 29 U.S.C. § 152(2).  *Id.* ¶ 5.  Plaintiffs claim that the Pension Fund is a multiemployer benefit fund and employee benefit plan as defined by ERISA § 3(3), 29 U.S.C. § 1002(2), (3), (21), § 1009(C) (1), (B), and §1132.  *Id.* ¶ 1.  The trustees for the Fund are fiduciaries within the meaning of ERISA, 29 U.S.C. §§1102(a) and 1002(16), (21).  *Id.*  Williams "is a fiduciary of the Pension Fund within the meaning of 29 U.S.C. §1002(21) with respect to the collection of contributions and other amounts due to all plaintiffs." *Id.* ¶ 4.  In addition, plaintiffs allege that FTI is an employee benefit plan under ERISA, 29 U.S.C. §1002(37), (1), and (3).  *Id.*

---

[1] In its filings, the Fund asserts that it seeks default judgment under both Fed. R. Civ. P. 55(b)(1) and Fed. R. Civ. P. 55(b)(2).  *Compare* ECF  8-2 at 1 *with id.* at 4.  Because plaintiffs ask the Court, not the Clerk, to enter a default judgment, the Court shall assume that plaintiffs seek judgment pursuant to Fed. R. Civ. P. 55(b)(2).

[2]  Upon default, plaintiffs' allegations in the Complaint and the Motion are deemed admitted.  Fed. R. Civ. P. 8(b)(6).  This factual summary is derived from plaintiffs' allegations.

The PAT Fund "is an unincorporated association or fund established pursuant to 52 U.S.C. § 30101 *et seq.* by the International Union of Painters and Allied Trades for the purpose of advancing the political interests of its members[.]" *Id.* ¶ 2. The LMCI "is a joint labor and management initiative and is an unincorporated organization established under 29 U.S.C. § 186(c)(9) for one or more of the purposes set forth in section 5(b) of the Labor Management Cooperation Act of 1978." *Id.* ¶ 3.

Shoemaker was a "party to or agreed to abide by the terms and conditions of a collective bargaining and/or other labor agreement(s) . . . with one or more local labor union(s) and/or district council(s) affiliated with the International Union of Painters and Allied Trades, AFL CIO, CLC[.]" *Id.* ¶ 11.[3] Plaintiffs refer to these agreements as the "Bargaining Agreement" or "Bargaining Agreements[.]" *See, e.g., id.*; ECF 8-2 at 5. Plaintiffs also claim that their governing documents are incorporated in the Bargaining Agreement and are "binding on" Shoemaker. ECF 1, ¶ 12. Plaintiffs refer to their governing documents as the "Trust Agreements." *Id.*

Plaintiffs appended three agreements to the Motion: (1) "District Council 91, Glaziers Local #1165 (Evansville Area) Memorandum of Agreement" (*id.* at 1, "MOA"); (2) "Collective Bargaining Agreement By and Between International Union and Painters and Allied Trades, District Council 91 and the Evansville 'Area M' Glazing Contractors Effective 7/1/2024 through 6/31/2027" (*id.* at 2–11); (3) "International Painters and Allied Trades Industry Pension Fund Agreement and Declaration of Trust" (*id.* at 12–19).

Plaintiffs claim that under the Trust Agreements and the Bargaining Agreement, Shoemaker "is required to regularly pay to the ERISA plaintiffs, the Bargained Entities, and the

---

[3] Plaintiffs do not define the terms "AFL CIO" or "CLC". *See* ECF 1, ¶ 11.

Union,[4] certain sums of money, the amounts of which are determined by the hours worked by Defendant's employees." ECF 1, ¶ 12; *see also id.* ¶ 15 (stating that defendant must "report and pay certain sums of money, the amounts of which are determined by the hours worked by Defendant's employees"). According to plaintiffs, "[c]ontributions are required to be made on a timely basis and are considered delinquent if not received timely." *Id.* ¶ 12. And, "interest accrues on delinquent contributions at the rates reasonably set by the Boards of Trustees from the day contributions become delinquent until paid." *Id.* Additionally, under the Bargaining Agreement and Trust Agreements, Shoemaker must "pay liquidated damages for each delinquent contribution." *Id.* Accordingly, plaintiffs assert that "the exact and most current amount due from Defendant to Plaintiffs will be ascertained at the time of judgment." *Id.* ¶ 15.

Further, the Bargaining Agreement and Trust Agreements "require that Defendant maintain time records or timecards and submit any and all relevant records to Plaintiffs for examination to determine whether Defendant is making full and prompt payment of all sums required to be paid by Defendant to Plaintiffs." *Id.* ¶ 13. According to plaintiffs, Shoemaker "has failed to comply with an audit of its records for the period from January 1, 2019 through the date of inspection." *Id.* ¶ 14.

In addition to the monthly contribution payments, plaintiffs assert that they "are entitled to recover any and all other contributions, and all liquidated damages and interest on delinquent contributions not specified above, including those found due on timecards, audit, or otherwise, and estimated contributions for any months Defendant failed to report to Plaintiffs, through the time of Judgment[.]" *Id.* ¶ 15. Furthermore, plaintiffs claim that they "are entitled to estimate

---

⁴ Plaintiffs collectively refer to "the local labor union(s), district council(s) and International Union" as the "Union." ECF 1, ¶ 11.

contributions for any unreported months pursuant to Pension Fund policy." *Id.* And, plaintiffs "reserve the right to conduct an audit or a further audit to determine whether there are any additional amounts due from Defendant." *Id.*

Plaintiffs draw the Court's attention to Section I.52 of the Pension Trust Agreement, titled "Audits." ECF 8-2 at 6. It provides, ECF 8-5 at 18:

> The Trustees may at any time have an audit performed by an accountant or other representative of the Fund ('Auditor') of all of a Contributing Employer's payroll, wage and cash disbursement records, general ledger, tax returns, and all other financial records ('Records') that the Auditor deems necessary to determine the accuracy, completeness and timeliness of the Contributing Employer's contributions, including Records relating to individuals performing services for the Contributing Employer for whom the Contributing Employer takes the position that no contributions are due.

Additionally, plaintiffs claim that the "Bargaining Agreements" provide that "Plaintiffs have the authority to have a certified public accountant audit the payroll, wage, and other relevant records of Defendant for the purpose of determining the accuracy of contributions to each respective Fund." ECF 8-2 at 6–7. In support of this assertion, plaintiffs point to Article XXI, Section 3 of the Bargaining Agreement. *Id.*; *see* ECF 8-5 at 7. It provides, in relevant part, ECF 8-5 at 7: "[T]he Trustees shall have the authority to have a certified public accountant audit the payroll, wage, and other relevant records of the Employer for the purpose of determining the accuracy of contributions to each respective Fund."

In the Complaint, plaintiffs seek a judgment against Shoemaker for "[a]ny unpaid contributions due at time of Judgment [and] any other contributions determined as due by audit, timecards, or otherwise, including estimated contributions for any months Defendant fails to report to Plaintiffs[.]" ECF 1 at 6. Plaintiffs request liquidated damages on all late-paid and unpaid contributions in an amount provided for under the Bargaining Agreement and Trust Agreements;

interest on all late-paid and unpaid contributions; and attorneys' fees and costs of this action, including audit fees. *Id.* at 7. Additionally, plaintiffs seek an order, *id*.:

> (a) requiring that Defendant comply with their obligations to Plaintiffs under the terms of the Bargaining Agreement and the Trust Agreements, including permitting an audit of its records as requested by Plaintiffs;

> (b) enjoining Defendant from violating the terms of those documents and of ERISA; and;

> (c) enjoining Defendant from disposing of any assets until said terms have been complied with, and from continuation or operating of Defendant's business until said terms have been complied with.

In the Motion, plaintiffs also seek $9,797 in attorneys' fees and costs. ECF 8-2 at 7; *see* ECF 8-3, ¶ 14. In addition, plaintiffs seek injunctive relief to compel Shoemaker "to comply with their obligations to Plaintiffs to permit the audit of their payroll records requested by Plaintiffs[.]" ECF 8-2 at 11.

In support of the Motion, plaintiffs have submitted the Declaration of Michael O'Malley. ECF 8-3; ECF 8-4 (O'Malley Decl.).[5]  O'Malley is "the Audit and Collections Director for Plaintiffs the International Painters and Allied Trades Industry Pension Fund[.]" ECF 8-3, ¶ 1. In this capacity, O'Malley keeps and maintains "records of contributions received by the Fund, maintain[s] individual records of each person, company or corporation obligated to remit contributions to the Fund, and maintain[s] individual records of each individual employee for whom those contributions were remitted." *Id.*

O'Malley avers that he is "personally knowledgeable of the business records and files maintained by the Fund with respect to" Shoemaker. *Id.* ¶ 2. He attests that Shoemaker, as a

---

[5] Plaintiffs submitted O'Malley's Declaration as two separate documents: ECF 8-3 and ECF 8-4. ECF 8-3 contains the entire Declaration. ECF 8-4 is a copy of the last page of the Declaration, which contains O'Malley's signature.

signatory to the Bargaining Agreement, has an obligation to "report and pay contributions to the Fund as well as comply with an audit of their payroll, wage and other relevant records for the purpose of determining the accuracy of their contributions to the Fund." *Id.* ¶ 3.  And, O'Malley asserts that the Bargaining Agreement bind defendant to the terms and conditions of the Trust Agreement. *Id.*

According to O'Malley, the MOA "binds Defendant to the current and subsequent Bargaining Agreements and any extensions and/or amendments thereto, unless either party serves written notice upon the other at least sixty (60) days and no more than ninety (90) days prior to the stated expiration date in the agreement or to any subsequent expiration date of a desire to terminate the MOA." *Id.* ¶ 4.

O'Malley references Article XXXVI of the Bargaining Agreement, titled "Duration Clause." ECF 8-3, ¶ 7; *see* ECF 8-5.  According to O'Malley, pursuant to the Duration Clause "the Bargaining Agreements *shall continue from year to year after their expiration dates unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) and not more than ninety (90) days prior to the expiration of any subsequent contract year*." ECF 8-3, ¶ 7 (emphasis in original); *see* ECF 8-5 at 10.   According to O'Malley, because "Defendant failed to serve a notice of cancellation and/or notice of termination regarding the MOA and/or Bargaining Agreements, they remain bound to the terms of all of the successive Bargaining Agreements[.]" ECF 8-3, ¶ 7.

Further, O'Malley avers that Legacy Professionals LLP (the "Auditor") was asked "to conduct an audit of Defendant's payroll records for the period from January 1, 2019 through the date of inspection[.]" *Id.* ¶ 9.  O'Malley specifies the documents that defendant must provide in order for plaintiffs to be able to conduct the audit, as follows, *id.*:

- Defendant's payroll records including detail on hours worked and gross wages paid;

- Defendant's Form 941 quarterly payroll tax returns and annual earnings reports, Forms W-2 and W-3, and 1099 and 1096;

- Defendant's State quarterly unemployment insurance reports (including hour and gross wage detail);

- Defendant's monthly contribution reports to all other fringe benefit funds to which Defendant contributes;

- Defendant's cash disbursements records;

- Personnel information, including Defendant's employees' 401(k) withholding elections, time/job cost tickets, hire and termination dates, and employee classifications.

O'Malley avers that the Auditor "advised" him "that they were unable to complete the Audit because defendant failed to provide the records and documents that they requested." *Id.* Then, on April 9, 2025, O'Malley's office "reassigned the Audit to Schultheis & Panettieri, LLP ('Schultheis')." *Id.* ¶ 10. O'Malley states that Shoemaker "must contact" Jonathan Valino at Schultheis "to arrange to provide the records and documents described above to Schultheis electronically." *Id.*

Plaintiffs also claim that, pursuant to the Bargaining Agreement and Trust Agreements, as well as ERISA, Shoemaker "must pay attorneys' fees and costs[.]" ECF 8-2 at 7; *see* ECF 8-3, ¶¶ 11–13. They cite (ECF 8-2 at 6) Section I.52 of the Pension Trust Agreement, titled "Audits." It states, ECF 8-5 at 18 (emphasis added):

> *If the Contributing Employer fails to provide all of the Records requested by the Auditor, the Trustees may require that the Contributing Employer pay to the Fund all costs incurred as a result of such failure, including without limitation attorneys' fees and costs.* The Trustees may require a Contributing Employer found delinquent or in violation of the Plan (or Trustee rules, regulations or policies) as a result of an audit to pay to the Fund the cost of the audit as well as interest and liquidated damages on the delinquent contributions.

In addition, plaintiffs claim that the "Bargaining Agreements further provide that Defendant is liable for all costs of collecting any [contribution] payments due, including attorneys' fees." ECF 8-2 at 7 (alteration in original).  In support of this assertion, plaintiffs cite Article XXI, Section 4 of the Bargaining Agreement.  *See* ECF 8-2 at 7.  It states, ECF 8-5 at 7 (emphasis added):

> If an Employer fails to make contributions to any of the Funds described in paragraph 1 hereof within twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of this Agreement and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any provisions hereof to the contrary notwithstanding, and the *Employer shall be liable for all costs of collecting the payments due, together with the attorneys' fees and such penalties as may be assessed by the Trustees of each respective Fund*. The Employer's liability for payment under this provision shall not be subject to or covered by any "no-strike" clause which may be provided or set forth elsewhere in this Agreement and such provisions shall not apply in the event of a violation of this clause.

Additional facts are included, *infra.*

## II.    Fed. R. Civ. P. 54 and 55

Rule 55(b) of the Federal Rules of Civil Procedure governs default judgment.  In particular, Rule 55(b)(1) provides that the clerk may enter a default judgment if plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[6]  But, "[a] plaintiff's assertion of a sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence."  *Monge v.*

---

[6] If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2) ("The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.").

*Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[7]

The Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, 588 U.S. 909 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013); *Benchmark Ins. Co. v. Total Remodeling Contractor LLC*, LKG-25-00811, 2026 WL 319051, at *3 (D. Md. Feb. 6, 2026). However, the policy is not absolute. Entry of default judgment under Rule 55(b)(2) "is left to the discretion of the court." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). And, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebaut, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see Lawbaugh*, 359 F. Supp. 2d at 421.

When a default judgment is entered, plaintiff's factual allegations, other than those pertaining to damages, are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6); *see also Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that the court accepts as true the well pleaded factual allegations in the Complaint as to liability). Nevertheless, as to a default judgment, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action. *Id.* at 780–81.

If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages. *Id*. Allegations "relating to the amount of damages" are not

---

[7] Judge Grimm authored *Monge* when he served as a United States Magistrate Judge. He subsequently served as a United States District Court Judge in Maryland. Judge Grimm retired from judicial service in December 2022.

11

deemed admitted based on a defendant's failure to respond to a suit.  Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Trs. Of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14, 2009) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc*., NKM-09-0004, 2009 WL 1872535, at *1 (W.D. Va. June 30, 2009) ("Upon default judgment, Plaintiff's factual allegations are accepted as true for all purposes excluding determination of damages.").

Rather, the court must make an independent determination regarding damages.  *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999).  In so doing, the court may conduct an evidentiary hearing.  Fed. R. Civ. P. 55(b)(2).  However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages.  *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc*., ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge,* 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc.*, 2009 WL 1872535, at *2 (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages); *JTH Tax, Inc. v. Smith*, RAJ-06-0076, 2006 WL 1982762, at *3 (E.D. Va. June 23, 2006) ("If the defendant does not contest the amount pleaded in the complaint and the claim is for a sum that is certain or easily computable, the judgment can be entered for that amount without further hearing.").

12

Fed. R. Civ. P. 54(c) is also pertinent.  It provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages."). This is meant to enable the defendant to decide whether to expend the resources to defend the action.  *Monge*, 751 F. Supp. 2d at 796.

### III.    Discussion

### A.  Liability

As stated, plaintiffs claim that Shoemaker is an employer under ERISA, 29 U.S.C. § 102(5), and the NLRA, 29 U.S.C. § 152(2).  ECF 1, ¶ 5.  Accepting plaintiffs' allegations as true, as this Court must, Shoemaker is subject to the contribution requirements in ERISA.  ECF 8-2 at 5–6.  Furthermore, plaintiffs claim that Shoemaker is obligated to permit an audit of its payroll records to determine whether it has paid sums to the Fund as required under the terms of the Bargaining Agreement and Trust Agreements as well as ERISA.  *Id.* at 5.

Section 515 of ERISA is pertinent.  It provides, 29 U.S.C. § 1145:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

"Section 515 'creates a federal right of action independent of the contract on which the duty to contribute is based.'"  *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997).  Indeed, "section 515 puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles."  *Id.*   The Fourth Circuit has explained: "Section 515 strengthens the position of multiemployer plans by holding employers and unions to the literal terms of their written

13

commitments. Because an employer's obligation to a multiemployer fund is determined by the plain meaning of the language used in the collective bargaining agreement, the actual intent of the contracting parties (i.e., the employer and the local union) is immaterial when the meaning of that language is clear." *Id.*.

"Section 502 of ERISA sets forth the damages that can be recovered for an employer's failure to remit contributions as required by Section 515 of ERISA." *Trs. of Plumbers Loc. Union No. 1 Welfare Fund v. Temperini Mech. Inc.*, LB-18-2596, 2018 WL 8452493, at *5 (E.D.N.Y. Dec. 28, 2018), *report and recommendation adopted sub nom.*, 2019 WL 2301613 (E.D.N.Y. May 30, 2019). Among the relief provided in Section 502(g)(2)(e) is "such other legal or equitable relief as the court deems appropriate." In other words, "[u]nder ERISA, the court has discretionary authority to grant injunctive relief when doing so is necessary to protect the rights of fund participants and beneficiaries." *Nat'l Elec. Benefit Fund v. EGF Elec. Inc.*, GJH-17-857, 2018 WL 802418, at *2 (D. Md. Feb. 7, 2018). Even when "[p]laintiffs do not request a specific amount of damages because they do not know the amount of unpaid contributions," but rather "request an audit of" an employer's records, it is appropriate for the court to issue "an Order that the Defendant be required to pay the amount the audit determines is owed," pursuant to Section 502(g)(2)(e). *Trs. of Nat'l Automatic Sprinkler Indus. Welfare Fund v. First Responder Fire Prot. Corp.,* GJH-16-2901, 2017 WL 2570888, at *3 (D. Md. June 12, 2017).

Plaintiffs also allege that Shoemaker has a contractual obligation to comply with an audit of its records, to allow plaintiffs to determine whether it has been making its required contributions. ECF 1, ¶¶ 13, 15. Plaintiffs claim that Shoemaker breached this duty by not permitting an audit of its records. *Id.* ¶ 14. The contracts plaintiffs have submitted in support of their Motion

14

substantiate that Shoemaker is contractually bound to comply with the audit that plaintiffs have requested.  *See* ECF 8-5 at 7, 18.

Furthermore, Section 301(a) of the LMRA establishes this Court's jurisdiction for the suit. It provides, 29 U.S.C. § 185:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Section 301 of the LMRA "authorizes plaintiffs, as an employee benefit trust fund and trustee, to bring such an action to enforce the terms of the CBA and to seek remedies for its breach." *Int'l Painters & Allied Trades Indus. Pension Fund v. DLC Corp.*, BPG-11-1938, 2012 WL 1229491, at *4 (D. Md. Apr. 11, 2012).

Plaintiffs have established defendants' failure to permit the required audit, which constitutes a breach by defendant of its obligations under the Bargaining Agreement and the Trust Agreements.  The audit is a critical tool to assure defendant's compliance with its contribution obligations under Section 515 of ERISA.  And, because plaintiffs have established defendant's liability for a breach of the Bargaining Agreement and the Trust Agreements, plaintiffs may enforce the terms of those agreements under the LMRA.

### B.  Remedies

### 1.  Injunctive Relief

"In conjunction with a default judgment, the Court also may order injunctive relief." *Laborers' Dist. Council Pension v. E.G.S., Inc.*, WDQ-09-3174, 2010 WL 1568595, at *5 (D. Md. Apr. 16, 2010).  As stated, ERISA gives a court the power to grant "such other legal or equitable relief as the court deems appropriate[.]" 29 U.S.C. § 1132(g)(2)(E).  "Courts have held that this equitable relief includes injunctive relief requiring defendants to 'permit, and cooperate with, an

15

audit of its books and records.'"  *Int'l Painters & Allied Trades Indus. Pension Fund v. Apostolos Grp., Inc.*, GLR-23-440, 2024 WL 916304, at *4 (D. Md. Mar. 4, 2024) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC,* 635 F. Supp. 2d 21, 26 (D.D.C. 2009)); *see Trs. of Iron Workers Loc. Union No. 5 & Iron Workers Emps. Ass'n Emp. Pension Tr. v. Facade Install Operating Co., D.C.,* GJH-18-1857, 2020 WL 949961, at *9 (D. Md. Feb. 27, 2020) ("Injunctive relief in the form of an order compelling a defendant to submit to an audit is permissible in ERISA and LMRA actions.").  Indeed, courts routinely award injunctive relief to require a delinquent defendant to submit to an audit to comply with its contractual and statutory obligations.  *See, e.g., DLC Corp.*, 2012 WL 1229491, at *7 ("Courts have recognized their power under ERISA to issue injunctions ordering employers to comply with the obligations of their labor contracts, including contractual agreements for an audit.").

In particular, plaintiffs ask the Court to enter an order "requiring Defendant to comply with their obligations to Plaintiffs to permit the audit of their payroll records requested by Plaintiffs for the period from January 1, 2019 though the date of inspection ('the Audit')."  ECF 8-2 at 11. "Because ERISA authorizes injunctive relief as a possible remedy, an injunction requiring Defendants to submit to an audit is warranted as long as the Funds establish the prerequisites for an injunction – namely, a showing of irreparable harm and the absence of an adequate legal remedy." *Trs. of Plumbers & Gasfitters Loc. 5 Ret. Sav. Fund v. DC Mech., LLC*, DKC-22-2770, 2023 WL 3173919, at *3 (D. Md. May 1, 2023).

Plaintiffs claim that they are "entitled to recover any and all contributions, and all liquidated damages and interest on delinquent contributions, including those found due on timecards, audit, or otherwise[.]"  ECF 8-2 at 7.  They ask the Court to compel Shoemaker to provide copies of various records to plaintiffs' counsel and plaintiffs' auditor within thirty days

from the date of the Court's order. *Id.* at 11–12. These documents include defendant's payroll records, including detail on hours worked and gross wages paid, defendant's cash disbursement reports, and personnel information. *Id.* Furthermore, plaintiffs ask the Court to instruct that, "in the event that Plaintiffs' Auditor determines that additional records or documents from Defendant are necessary to complete the Audit, and requests the same from Defendant, Defendant must promptly provide the requested documents/information, within ten (10) days of the date of the Auditor's request." *Id.* at 12. Plaintiffs also request that "once Defendant has complied with the Audit and if amounts are found due, Plaintiffs may request an Amended Judgment against Defendant including the amounts found due as a result of the audit, plus any additional attorneys' fees and costs incurred." *Id.* Plaintiffs also ask the Court to retain jurisdiction over this suit and issue an order that plaintiffs be awarded, according to proof, attorneys' fees and costs. *Id.*

Injunctive relief is appropriate because, without an audit, plaintiffs cannot enforce their contractual rights pursuant to the Bargaining Agreement and Trust Agreements. *See Int'l Painters & Allied Trades Indus. Pension Fund v. 3 R Painting & Contracting Co.*, RDB-12-272, 2013 WL 424694, at *10 (D. Md. Jan. 31, 2013) ("Given that the audit and remittance reports have been made necessary by the Defendant's continued delinquency and failure to comply with its contractual obligations, the Plaintiffs are entitled to this injunctive relief."); *Int'l Painters & Allied Trades Indus. Pension Fund v. H.C. Ackerman & Son, Inc.*, JKB-11-2117, 2012 WL 251963, at *4 (D. Md. Jan. 24, 2012) (concluding that granting an "injunction" is appropriate relief "because Defendant is already obliged to submit to an audit under the terms of the Labor Contract . . . and because the audit is necessary to enable Plaintiffs to determine the precise amounts Defendant owes in unpaid contributions as well as to obtain information about individual participants' benefits eligibility").

Defendant's failure to comply with the audit "compounds Plaintiffs' injuries, particularly because without this information Plaintiffs' cannot accurately calculate the full extent of contributions Defendant has failed to make." *See Nat'l Elec. Benefit Fund v. 3W Elec. LLC*, PWG-16-1580, 2017 WL 1079954, at *7 (D. Md. Mar. 20, 2017).   Therefore, "Plaintiffs have demonstrated irreparable injury and the inadequacy of remedies at law." *Id.*  Furthermore, because defendant agreed to the contractual obligation to comply with an audit, the balance of hardships tips in favor of granting the injunction. *See id.*  And, "the enforcement of employee . . . agreements under ERISA serves the public interest by ensuring that employees receive the pensions they are owed." *Id.*

Accordingly, I shall grant plaintiffs' request for injunctive relief to compel Shoemaker to comply with an audit of their payroll records for the period from January 1, 2019 through the date of inspection.

### 2. Attorneys' Fees and Costs

For the reasons articulated by plaintiffs, I agree that they are entitled to an award of attorneys' fees.  Pursuant to 29 U.S.C. § 1132(g)(2) (D), when the Court enters judgment in favor of the plaintiff in an ERISA action for a plan to recover unpaid contributions, it "shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant." Furthermore, the Bargaining Agreement and Trust Agreements contain provisions guaranteeing payment of attorneys' fees for plaintiffs for efforts to compel defendant's compliance with its contribution requirements, including an audit.  ECF 8-5 at 7, 18.

The lodestar method is ordinarily used to determine an appropriate and reasonable counsel fee award. It involves multiplying the lawyer's reasonable hourly rate by the number of hours reasonably expended. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *see McAfee v. Boczar*, 738

18

F.3d 81, 88 (4th Cir. 2013), *as amended* (Jan. 23, 2014); *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).

The Supreme Court has observed that the lodestar method produces presumptively reasonable fee awards, and is "readily administrable." *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (citing *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992)); *see Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 610 (2001). "A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious . . . case." *Perdue*, 559 U.S. at 552.

The lodestar calculation relies on "objective" standards, *i.e.*, "'the prevailing market rates in the relevant community,'" and what the attorney would have received from "a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 551 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The standard "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Id.* at 552. Indeed, there is "a strong presumption that the lodestar number represents a reasonable attorney's fee." *McAfee*, 738 F.3d at 88-89) (internal quotation marks omitted).

In *McAfee*, 738 F.3d 81, a case lodged pursuant to 42 U.S.C. § 1983, the Fourth Circuit said, *id.* at 88:

> The proper calculation of an attorney's fee award involves a three-step process. First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*See also Dreamworks Motorsports, Inc. v. Klein,* 2026 WL 837544, at *3 (4th Cir. Mar. 26, 2026) (per curiam); *Kubas v. 331B, LLC*, 2026 WL 766466, at *1 (4th Cir. Mar. 18, 2026) (per curiam).

The *Johnson* factors, referenced in *McAfee*, are as follows: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *McAfee*, 738 F.3d at 88 n.5; *see Johnson*, 488 F.2d at 717–19.[8]

The *Johnson* factors are considered by a court "'in conjunction with the lodestar methodology' and, 'to the extent that any of these factors already has been incorporated into the lodestar analysis, [it does] not consider that factor a second time.'" *Dorsey v. TGT Consulting, LLC*, CCB-10-92, 2014 WL 458999, at *2 (D. Md. Feb. 4, 2014) (quoting *E. Assoc. Coal Corp. v. Dir., Office of Workers' Comp. Program*, 724 F.3d 561, 570, 570 n.5 (4th Cir. 2013)); *see also*,

---

[8] In *Corral v. Montgomery Co.*, 91 F. Supp. 3d 702, 713 n. 4 (D. Md. 2015), Judge Chasanow noted that the Supreme Court seemed to question the *Johnson* approach in *Perdue*, 559 U.S. at 551–52, describing it as an "alternative" to the lodestar method and explaining that it provides too little guidance for district courts and places too much emphasis on subjective considerations. The Supreme Court said, *id.* at 551: "[T]he lodestar method is readily administrable, and unlike the *Johnson* approach, the lodestar calculation is objective, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." (internal citations omitted).

Nonetheless, "the *Johnson* factors, as opposed to the *Johnson* method, are still relevant in informing the court's determination of a reasonable fee and a reasonable hourly rate"; "[*Perdue*] cautions against using a strict *Johnson* approach as the primary basis for determining reasonable attorneys' fees, but nowhere calls into question the idea of using relevant *Johnson* factors in helping to come to a reasonable fee." *Spencer v. Cent. Servs., LLC*, CCB–10–3469, 2012 WL 142978, at *5–6 (D. Md. Jan. 13, 2012) (internal quotations marks and citations omitted).

*e.g.*, *Hensley*, 461 U.S. at 434 n.9 ("[M]any of the [*Johnson*] factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.").

The movant "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437; *see McAfee* 738 F.3d at 244 (*citing Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)); *see also Corral v. Montgomery Co.*, 91 F. Supp. 3d 702 (D. Md. 2015). The movant also bears the burden to show that an upward adjustment to the lodestar amount is necessary. *See*, *e.g.*, *Blum*, 465 U.S. at 898.

For the court to determine the reasonableness of a request for attorney's fees, the party seeking to recover legal fees "must provide 'detailed records' that specify 'the services performed, by whom they were performed, the time expended thereon, and the hourly rate charged.'" *Matias Guerra v. Teixeira*, TDC-16-0618, 2019 WL 3927323, at *2 (D. Md. Aug. 20, 2019) (quoting *Bel Air Plaza Ltd. P'ship v. Ross Dress for Less, Inc.*, CCB-14-2533, 2016 WL 3440191, at *1 (D. Md. June 23, 2016)). Plaintiffs have done so here.

Notably, counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434. "'Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.'" *Id.* (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc) (emphasis in *Copeland*)).

After consideration of the lodestar amount and any appropriate adjustments, the court must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones," and "award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *McAfee*, 738 F.3d at 88 (citations omitted); *see also Grissom*, 549 F.3d at 313 (same);

21

*Jackson v. Estelle's Place, LLC*, 391 F. App'x 239, 243 (4th Cir. 2010) (affirming application of same analysis to fees awarded under FLSA).  But, the Supreme Court has said that trial courts "need not, and indeed should not, become green-eyeshade accountants."  *Fox v. Vice*, 563 U.S. 826, 838 (2011).  Thus, trial courts "may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Id.*

Under Rule 1.5(a)(3) of the Maryland Rules of Professional Conduct, a court reviewing an attorney's fee request must consider "the fee customarily charged in the locality for similar legal services."  In this inquiry, the Fourth Circuit follows the "locality rule," whereby "'[t]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.'"  *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 173 (4th Cir. 1999) (citation omitted).

This Court's Local Rules are also relevant.  Local Rule 109.2(b) requires an attorneys' fees motion to be properly supported and prepared in accordance with the Court's "Rules and Guidelines for Determining Attorneys' Fees in Certain Cases," if they are applicable.  *See* Local Rules App. B (the "Guidelines").  The Guidelines are applicable here, as they "apply to cases in which a prevailing party would be entitled, by applicable law or contract, to reasonable attorneys' fees . . . ."  *Id.* at 1 n.*.  Among other things, the Guidelines set out mandatory rules regarding billing format and time recordation, organized by litigation phase, and require submission of quarterly statements to opposing counsel. *Id.* § 1. They also outline non-compensable time and reimbursable expenses and establish hourly rates for attorneys based on experience. *Id.* §§ 2–4.

This Court "recently updated its Guidelines Regarding Hourly Rates in the Local Rules[.]" *Schrider v. Devlin Contracting & Maint., Inc.*, BAH-24-2978, 2026 WL 110330, at *4 (D. Md. Jan. 14, 2026).  As to the hourly rates, the Guidelines now provide, Guidelines § 3:

22

> Reasonable hourly rates should be determined by the Court using declarations, affidavits, stipulations by the parties, or other evidence. A useful guideline for hourly rates may be provided by the Fitzpatrick Matrix[] as adjusted annually, with a reduction of 5% to 20% (to reflect differences between the legal markets in Washington, D.C. and Maryland).

"[T]he Guidelines also make clear that the factors identified in pertinent caselaw still govern, and that a court should determine a reasonable fee award 'in accordance with relevant case law.'" *Hernandez v. Olney Enters., Inc.*, GLS-25-01528, 2026 WL 290967, at *5 (D. Md. Feb. 3, 2026) (quoting Guidelines § 3); *see Tamikka W. v. Bisignano,* GLS-21-00541, 2025 WL 3754144, at *3 (D. Md. Dec. 29, 2025); *Trs. of Plumbers & Gasfitters Loc. 5 Ret. Sav. Fund v. Magothy Mech. LLC*, TDC-25-01249, 2025 WL 3711726, at *8 (D. Md. Dec. 22, 2025).

The Fourth Circuit has indicated that "fee matrices can be 'a useful starting point to determine fees.'" *De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753 (4th Cir. 2025) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)). But, a court is not "'bound by'" the ranges specified in a fees matrix. *De Paredes*, 134 F.4th at 754 (quoting *Newport News Shipbuilding,* 591 F.3d at 229). Rather, "the court must consider all relevant evidence to determine the prevailing market rates in the relevant community, including lawyer affidavits, fee awards in similar cases, general surveys, fee matrices, and even its own personal knowledge[.]" *Id.* at 754 (internal citations and quotation marks omitted). Indeed, "[w]hen considering a published fee matrix, like the Fitzpatrick Matrix, Loc. R. App'x B.3 (D. Md. 2025), the Court cannot 'elevate a matrix above all other types of evidence or treat a matrix as establishing a presumptive answer or range of answers.'" *Tesfay v. Travel Centers of Am*., CJC-25-1242, 2026 WL 171710, at *2 (D. Md. Jan. 22, 2026) (quoting *De Paredes*, 134 F.4th at 754).

With this framework, I turn to the Motion. As stated, plaintiffs seek attorneys' fees under 29 U.S.C. § 1132(g)(2)(D) and the terms of the Bargaining Agreement and Trust Agreements. ECF

8-5 at 7, 18; ECF 8-2 at 8–9.  The request is supported by the Declaration of Michele R. Stafford, Esquire (ECF 8-6), dated September 4, 2025 (*id.* at 6), and multiple invoices from counsel to plaintiffs.  *See* ECF 8-7.  Stafford was the attorney for plaintiffs who appears to have had primary responsibility for this case.  *See* ECF 8-7.

Stafford is a partner at the law firm of Tucker Arensberg, LLP (the "Firm"),[9] which is located in Pittsburgh, Pennsylvania.  ECF 8-6, ¶¶ 1, 2.  The Firm has more than 80 attorneys, a national ERISA practice, and represents many multiemployer funds based in the greater Pittsburgh area.  *Id.* ¶¶ 2, 4.  Stafford avers that she is "primarily responsible for the numerous collection cases" that the Firm "handles" for plaintiffs.  *Id.* ¶ 6.

The invoices submitted by plaintiffs (ECF 8-7) describe the work performed by two lawyers and three paralegals in 2024 and 2025.  *See id.*  They also identify the particular person who performed the work; the dates the work was performed; the length of time expended; and the hourly rate of the lawyer or paralegal.  *See, e.g., id.* at 1.  Stafford asserts that, along with herself, Elise Cotterill, Paula Morelli, Katie Meyers, and Christopher J. Parker, Jr. worked on this matter.  ECF 8-6, ¶ 7.

Plaintiffs seek a total of $9,287 for all the time billed by counsel and the paralegals through May 31, 2025.  ECF 8-6, ¶ 8.[10]  In particular, plaintiffs seek legal fees for services and costs from May 13, 2024, through April 30, 2025, for a total of $5,987.00.  *Id.*; *see* ECF 8-7 at 1.  And,

---

[9] In her Declaration, Ms. Stafford also refers to the Firm as "Tucker Arensberg PC" and states that the Firm does business as "Tucker Arensberg LLP in the State of California."  ECF 8-6, ¶ 1 n.1.

[10] When this Court added together the legal fees reflected in plaintiffs' invoices, it found that the requested fees totaled $9,294.50.  *See* ECF 8-7.  Plaintiffs do not address the small discrepancy between the amount they request in their Motion ($9,287.00) and the total sum contained in all of the invoices ($9,294.50).  *See* ECF 8-6 at 4; ECF 8-7.

plaintiffs seek $3,300.00 for services rendered but not yet invoiced as of the time of the filing of the Motion in September 2025, pertaining to the period May 1, 2025 through May 31, 2025.  ECF 8-6, ¶ 8.  Stafford avers that the Firm "bills its clients on a per month basis" but she had not "yet billed the Fund for the work during the month of May 2025."  *Id.* ¶ 13.  She also notes that the Fund has "paid all of its other invoices on time."  *Id.*

Stafford claims that, based on her "experience as an ERISA attorney for several multiemployer trust funds throughout the country . . . the hourly rates set forth . . . are reasonable and in line with the prevailing rates, including in comparable legal markets like Pittsburgh, Pennsylvania, Kansas City, Kansas, and Spokane, Washington," where plaintiffs have been "repeatedly granted fee awards."  *Id.* ¶ 9.  And, Stafford notes that plaintiffs' "fees have been found to be reasonable," and plaintiffs "have been granted fee awards" in Maryland.  *Id.*  Stafford claims that the Firm "does not include any anticipated fees that may be incurred in the collection of any money judgment entered in this case."  *Id.* ¶ 10.

Several of the individual entries in the invoices contain descriptions of work that include multiple activities.  For example, for an entry on June 6, 2024, Stafford billed plaintiffs for 0.3 hours of her time, *i.e.*, 18 minutes, claiming that she spent this time as follows: "Meet with E. Cotterill re further handling, review research re same[.]"  ECF 8-7 at 2.  In other words, the period of time pertains to multiple tasks.  This is a practice known as "block billing", *i.e.*, "'grouping, or lumping, several tasks together under a single entry, without specifying the amount of time spent on each particular task.'"  *Jones v. Southpeak Interactive Corp. of Delaware*, REP-12-443, 2014 WL 2993443, at *9 (E.D. Va. July 2, 2014), *aff'd,* 777 F.3d 658 (4th Cir. 2015) (quoting *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006)).  As one court has said:  "This practice is problematic because it does not provide the district court with a clear sense of how many hours

25

were performed on a particular task because multiple tasks are lopped into a single block of hours." *Triplett v. N. Carolina Dep't of Pub. Safety*, RLV-15-00075, 2017 WL 3840422, at \*4 (W.D.N.C. Sept. 1, 2017).

As noted, Stafford is "the attorney primarily responsible for the numerous collection cases" the Firm "handles for Plaintiffs[.]" ECF 8-6, ¶ 6. She directs "the overall strategy, as well as the work of the lawyers and paralegals assigned to each case." *Id.* Stafford has been licensed to practice law since 1994. *Id.* ¶ 7(a). She has "extensive experience in ERISA litigation" and has worked on ERISA cases "since 2003." *Id.* Stafford is "the responsible partner for over 100 pending matters, many of which are large scale complex litigation." *Id.* And, since 2014, Stafford has "lectured on various ERISA litigation topics[.]" *Id.* Through December 31, 2024, Stafford's time was billed at the rate of $350.00 per hour. *Id.* Beginning in January 1, 2025, Stafford's time was billed at $360.00 per hour. *Id.* Her requested hourly rate of $350 to $360 is reasonable, and approaches the Fitzpatrick Matrix range for Maryland lawyers with thirty to thirty-two years of experience ($827–$834). *See* Guidelines Appendix B § 3; *The Fitzpatrick Matrix*, FITZPATRICK MATRIX, https://perma.cc/Y9CZ-M7YT (last accessed Feb. 16, 2026).[11]

The invoices reflect that, over roughly a year-long period, Stafford worked 7.2 hours on this case, totaling $2,554.00 in fees. *See* ECF 8-7. In particular, Stafford's invoices reflect that she reviewed and revised the Complaint and the Motion and supporting exhibits. *Id.* In my view, her expenditure of time was reasonable.

---

[11] The Court reduced the range of rates set forth in the Fitzpatrick Matrix by 10%, as suggested by the Local Rules, to correspond with the lower hourly rates for lawyers involved in federal litigation in Maryland, as compared to the District of Columbia. *See* Guidelines Appendix B § 3.

Stafford asserts that Parker joined the Firm in 2022 as senior counsel and was "recently made shareholder" of the Firm.  *Id.* ¶ 7(e).   He graduated from Duquesne University School of Law in 2014 and began practicing law that year.  *Id.*  Before coming to the Firm, Parker "worked for a boutique law firm in Washington, D.C. handling complex statutory and regulatory litigation in federal courts."  *Id.*  At the Firm, Parker "concentrates his practice in ERISA litigation."  *Id.* The Firm billed Parker's time at a rate of $350.00 per hour.  *Id.*   His hourly rate of $350 is reasonable, and approaches the Fitzpatrick Matrix range for lawyers practicing in Maryland with ten to twelve years of experience ($651–$679).  *See* Guidelines Appendix B § 3; *The Fitzpatrick Matrix*, FITZPATRICK MATRIX, https://perma.cc/Y9CZ-M7YT (last accessed Feb. 16, 2026).  Parker spent 0.6 hours on this matter, conferring with Stafford regarding the progression of this case, totaling $210 in legal fees.  Given Parker's limited role in the litigation, this amount is reasonable.

According to Stafford, Cotterill "received a Bachelor of Arts (B.A.) degree in Journalism from Sacramento State University in 2006, and a Paralegal Certificate from the University of California Davis Extension Program in 2007."  *Id.* ¶ 7(b).  In 2021, Cotterill joined the Firm as a paralegal and "has over twenty years of experience as a paralegal and/or as a legal assistant."  *Id.* Stafford asserts that "Cotterill has extensive experience in ERISA litigation, having worked on such cases since 2010."  *Id.*  Until December 31, 2024, Cotterill's time was billed at the rate of $200.00 per hour.  *Id.*  From January 1, 2025, Cotterill's time was billed at the rate of $210.00 per hour.  *Id.*  This hourly rate is reasonable, and is close to the hourly rate for paralegals in Maryland of $230.  *See* Guidelines Appendix B § 3; *The Fitzpatrick Matrix*, FITZPATRICK MATRIX, https://perma.cc/Y9CZ-M7YT (last accessed Feb. 16, 2026).

Cotterill worked extensively on this case.  Her work involved researching the governing collective bargaining agreements, communicating with the Auditor and defendant, coordinating

service of the suit, drafting the Motion, and preparing the underlying documentation for the damages calculation in the Motion. *See* ECF 8-7. Over the course of roughly a year, the invoices reflect that Cotterill spent 28 hours on this matter, with her fees totaling $5,827. Given Cotterill's work on this case, the requested sum is reasonable.

Stafford states that Paula Morelli and Katie Meyers are both paralegals at the Firm who "worked on this matter on a limited basis[.]" ECF 8-6. ¶ 7(c); *see id.* ¶ 7(d) (same). Morelli's time was billed at $210.00 per hour. *Id.* ¶ 7(c). Meyers's time was billed at $185.00 per hour. *Id.* ¶ 7(d). For the reasons stated as to Cotterill, these rates are reasonable. Both Meyers and Morelli spent limited time on this matter, coordinating service of the suit on Shoemaker, and preparing documents in support of the Complaint. Morelli spent a total of 1.5 hours on the case and plaintiffs seek to recover $315 in fees for her work; Meyers devoted 2.1 hours on this case and the Firm charged plaintiffs $388.50 for her work. Given the work both paralegals performed on this matter, the amount requested is reasonable.

To be sure, lawyers at a firm often confer on cases. Conferencing can be very useful for a variety of sound reasons. But, the Court is not required to impose on the defendant what is, to some extent, a duplicate billing. Throughout the invoices, there were numerous instances in which Ms. Stafford and Ms. Cotterill both billed plaintiffs for meetings they had with one another.

On June 6, 2024, Ms. Cotterill billed 0.1 hours regarding a meeting with Ms. Stafford to discuss this case. ECF 8-7 at 2. On the same day, Ms. Stafford billed 0.3 hours to meet with Ms. Cotterill "re further handling" and to "review research re same[.]" *Id.* Because Ms. Cotterill billed solely for her meeting with Ms. Stafford, I will assume that the meeting lasted 0.1 hours. To compensate for this double billing, I will reduce Ms. Cotterill's time by 0.1 hours. Similarly, on August 6, 2024, both Stafford and Cotterill billed 0.1 hours for meeting with one another regarding

28

this case. *Id.* at 4. Accordingly, I will reduce Cotterill's time by 0.1 hours. On October 24, 2024, Stafford and Cotterill met with one another, and each billed plaintiffs for 0.1 hours. Therefore, I shall reduce Cotterill's time by 0.1 hours.

On January 8, 2025, both Stafford and Cotterill met regarding the case. Stafford billed 0.3 hours for her work that day, which included meeting with Cotterill "re service of process, emails with process server re same[.]" *Id.* at 9. Cotterill also billed for 0.3 hours. Cotterill's work description states: "Meet with M. Stafford to discuss next actions and case status; review complaint and communications with process server; update litigation tracker[.]" *Id.* Because both Stafford and Cotterill block billed for this time, it is impossible to determine exactly how long the meeting between them lasted. I will reduce Cotterill's time by 0.1 hours for that entry. On January 22, 2025, Stafford and Cotterill both billed 0.1 hours for meeting with one another for the case. *Id.* Accordingly, I will reduce Cotterill's time by 0.1 hours, *i.e.*, the length of the meeting.

On March 5, 2025, both Cotterill and Stafford billed 0.1 hours for meeting with one another regarding the Motion. *Id.* at 13. Accordingly, I will reduce Cotterill's time by 0.1 hours. On March 11, 2025, Stafford billed 0.1 hours to document a meeting with Cotterill "re next steps[.]" *Id.* The same day, Cotterill billed 0.2 hours for time spent meeting with Stafford regarding the case, preparing the motion for default judgment, and updating the litigation tracker. *Id.* Because Stafford only billed for her meeting with Cotterill, the meeting must have lasted 0.1 hours. Accordingly, I will reduce Cotterill's time by 0.1 hours.

On May 12, 2025, both Cotterill and Stafford block billed. Cotterill billed for 1.1 hours. The description of her work is as follows: "Review additional CBAs provided by P. Parker, summarize documents received; meet with M. Stafford re CBAs for time period of audit[.]" *Id.* at 19. Stafford billed for 0.5 hours. Stafford described her work as follows: "Meet with E. Cotterill

re issues with CBAs, records for entire audit period, review newest CBAs forwarded by P. Parker re same[.]" *Id.* Because both individuals block billed, it is impossible to determine exactly how long the meeting lasted. I will reduce Cotterill's time by 0.3 hours. On May 15, 2025, Stafford billed 0.2 hours for her meeting with Cotterill. *Id.* On the same day, Cotterill billed 1.1 hours for numerous tasks that she completed on this case. *Id.* Because Stafford only billed for a meeting with Cotterill, I will reduce Cotterill's time by 0.2 hours, to correspond with the length of her meeting with Stafford.

On May 16, 2025, both Stafford and Cotterill block billed, including in their descriptions meetings with one another. *Id.* Stafford billed 0.4 hours and Cotterill billed 0.5 hours. Because Stafford and Cotterill block billed, the Court cannot ascertain with certainty the duration of their meeting. To compensate for this, I will reduce Cotterill's time by 0.2 hours. On May 19, 2025, both Stafford and Cotterill met to discuss a recommendation for a Wednesday meeting regarding the Motion. *Id.* Cotterill billed for 0.1 hours and Stafford billed for 0.2 hours. Because Cotterill only billed 0.1 hours for the meeting, I will assume that was the duration of the meeting. Accordingly, I will reduce the time of both Cotterill and Stafford by 0.1 hours.

On May 21, 2025, both Cotterill and Stafford block billed 0.2 hours for this matter. *Id.* Both individuals described meeting with one another among their activities. *Id.* Accordingly, I will reduce the amount Cotterill billed by 0.1 hours. On May 23, 2025, Stafford and Cotterill both billed for a meeting with one another regarding the Motion. *Id.* at 20. Stafford billed 0.1 hours for the meeting and Cotterill billed 0.2 hours. Because both individuals only billed for the length of the meeting, I will assume that the meeting lasted 0.1 hours. Accordingly, I will reduce Cotterill's time by 0.2, to account for the double billing for this meeting and to match the duration of the meeting with Stafford's entry.

With these adjustments, I have deducted a total of 1.9 hours from the time billed by Cotterill and Stafford, equal to $403.50.  This leaves 26.2 hours for Cotterill, at an hourly rate of $200 for her work before January of 2025 and an hourly rate of $210 for her work in 2025, for a total award of $5,452.  As to Stafford, she worked 7.1 hours, at the hourly rate of $350 in 2024 and $360 in 2025, for a total amount of $2,518.[12]

Reviewing the Rule 1.5 factors, the requested attorneys' fees are reasonable and appropriate.  Plaintiff has supported the fee request with documentation, and the hourly rates are well within the Fitzpatrick Matrix, as modified by this Court, given that this litigation took place in Maryland.

Additionally, plaintiffs request "costs in the amount of $500.00 incurred in this matter for the Complaint filing fee, and service of the Summons and Complaint on the Defendant."  *Id.* ¶ 11. These are reasonable expenses that are recoverable as part of the cost of litigation.  *See Carroll v. Paul L. Off., PLLC,* DKC-12-2041, 2013 WL 4008873, at *4 (D. Md. Aug. 2, 2013) ("Filing fees and service process fees are reasonable costs of litigation that may be recovered.").  Furthermore, the terms of the Bargaining Agreement and Trust Agreements require defendant to pay for the costs of collecting payments consistent with the audit.  *See* ECF 8-5 at 7; *id.* at 18.

Accordingly, I shall award legal fees in the total sum of $8,883.50.  And, I will award costs of $500.00.

Plaintiffs ask the Court to "issue an order that interest shall accrue at the current legal rate on the Judgment, until satisfied."  ECF 8 at 2.  "The post-judgment interest rate on money judgments in federal civil cases is mandatory and governed by statute."  *Mahoney v. iProcess*

---

[12] The Court only reduced one time entry for Stafford in May of 2025, after her hourly rate increased from $350 to $360.  *See* ECF 8-6, ¶ 7(a).

*Online, Inc.*, 681 F. Supp. 3d 446, 453 (D. Md. 2023). The statute that governs postjudgment interest is found in 28 U.S.C. § 1961. Accordingly, plaintiff is entitled to postjudgment interest, in accordance with 28 U.S.C. § 1961.

## IV. Conclusion

For the reasons stated, I shall enter judgment in favor of plaintiffs and against Shoemaker in the following amounts:

| | |
|---|---|
| Attorneys' Fees | $ 8,883.50 |
| Costs | $500.00 |

Furthermore, I shall grant plaintiffs' request for injunctive relief, requiring defendant to submit to an audit of defendant's payroll records. And, I shall retain jurisdiction to amend the judgment in the event that the audit reveals unpaid ERISA contributions, and possibly for an award of additional legal fees and costs.

An Order follows.

Date: May 6, 2026

          /s/

Ellen Lipton Hollander
United States District Judge